# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| JACI L. KITCH, | ) | |
| | ) | |
| Plaintiff, | ) | No. 3:13-cv-00482 |
| | ) | |
| v. | ) | Judge Nixon |
| | ) | Magistrate Judge Knowles |
| U.S. BANK NATIONAL ASSOCIATION | ) | |
| and U.S. BANCORP INVESTMENTS, INC., | ) | JURY DEMAND |
| | ) | |
| Defendants. | ) | |

## ORDER

Pending before the Court is a Motion for Summary Judgment ("Motion") (Doc. No. 28)

filed by Defendants U.S. Bank National Association and U.S. Bancorp Investments, Inc.

(collectively "U.S. Bank").  Also pending before the Court is Plaintiff's Motion for Partial

Summary Judgment Regarding Defendants' Affirmative Defenses (Doc. No. 31) and

Defendants' Motion to Strike Plaintiff's Counterstatement of the Facts (Doc. No. 40).  For the

reasons given below, Defendants' Motion is **GRANTED**, Plaintiff's Motion for Partial

Summary Judgment is **DENIED**, and Defendants' Motion to Strike is **DENIED AS MOOT**.

Plaintiff's Motions in Limine (Doc. Nos. 51, 53, and 59) are **DENIED AS MOOT**.

1

# I.  BACKGROUND

### A.  *Factual Background*[1]

This dispute involves alleged discrimination and termination on the basis of a disability. Plaintiff Jaci Kitch worked for U.S. Bank National Association as a Vice President and Corporate Trust Representative from May 15, 2006, through her April 20, 2012, termination. Donna Williams, Manager of the Nashville Corporate Trust Department, supervised Plaintiff and eight to ten other employees at U.S. Bank.  Williams and Plaintiff previously worked together at SunTrust Bank, enjoyed post-work drinks together once or twice weekly, and originally had a good relationship.  Williams recruited Plaintiff from SunTrust to U.S. Bank, but their relationship became "stretched" between May 2006 and April or May 2007 because they were each learning new jobs and new processes, handling a lot of work, and working long hours.

As a Vice President and Corporate Trust Representative, Plaintiff was entitled to a corporate credit card which she acknowledged was to be used strictly for business-related expenses except in the case of incidental expenses incurred in business travel, pursuant to U.S. Bank's Code of Ethics and Business Conduct.[2]  Plaintiff reviewed and became familiar with U.S.

---

[1] Unless otherwise noted, all facts are undisputed and drawn from Plaintiff's Response to Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment (Doc. No. 37). Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment.  *Duchon v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir. 1986).

[2] The Code of Ethics and Business Conduct also provides that "[m]isuse of the corporate credit card, falsification of business expenses, repeated late payments or excessive personal use of the corporate credit card may result in termination of card privileges and/or disciplinary action up to and including termination. If you are terminated, you must pay any outstanding corporate card balance immediately." (*Id*. at 77.)

2

Bank's Employee Handbook during her employment, including the job abandonment policy contained therein.[3]

In April 2007, Plaintiff was diagnosed with breast cancer. When Plaintiff informed Williams about the diagnosis, "[a]t first she was in shock," but then their relationship became "more and more distant." (*Id*. at 11.) From July 2007 through mid-December 2007, Plaintiff took FMLA leave to have surgery and chemotherapy treatment. Williams neither called nor visited Plaintiff during this time, which she found hurtful to the point of telling Williams, "you were my friend and you never even checked on me." When Plaintiff returned to work, she felt that "[i]t was just not the same" and that Williams "was more work oriented and less personable, but not in a manner that would interfere with work." Plaintiff resumed working "four hours a day and then went to six hours a day," and then eight hours per day. (*Id*. at 13.)

Sometime in 2008, Plaintiff took time off work to undergo a hysterectomy and returned, "work[ing] up slowly" to a full-time schedule. (*Id*.) Several years later, in Fall 2011, Plaintiff found new lumps in her breast which were biopsied (*id*.); she informed Williams on November 7, 2011 (Doc. Nos. 28-3 at 22; 36-2 at 9). In addition, Plaintiff was involved in three car accidents between December 2011 and January 2012 and was absent from work in early 2012 due to the resulting injuries and physical therapy. (Doc. No. 28-1 at 28.)

---

[3] The job abandonment policy (*id*. at 108) read as follows:

> If you remain absent from work for 2 consecutive work days and fail to report the absences directly to your manager or supervisor, absent extenuating circumstances, you may be assumed to have voluntarily abandoned your job. Contacting the U.S. Bank Employee Service Center or your Human Resources generalist does not satisfy the requirement to contact your manager directly to notify him or her that you will be absent, even if you are using or applying for STD and/or FMLA time. The voluntary termination will be processed as soon as practicable. The effective date of the Job Abandonment termination will be the end of the day on the second day of the absence.

3

Williams placed Plaintiff on a ninety-day action plan dated December 14, 2011, outlining certain areas in which she "Need[ed] Improvement" or was "Not Effective," including "Account review and set ups," "Advocating, escalating, and prioritizing workflow and transactions," "Communicating effectively," and "Understanding document structure on new and restructuring transactions." (*Id*. at 152.) Prior to the December 14 action plan, Williams had never disciplined Plaintiff. (Doc. No. 28-3 at 21.) Plaintiff was given until March 14, 2012, to either meet the action plan's goals or risk "disciplinary action up to and including immediate termination." (Doc. No. 28-1 at 157.) Williams referred Plaintiff to U.S. Bank's employee assistance program in case she felt that "work and/or personal issues" may have been impacting her job performance. (*Id*. at 158.) Plaintiff acknowledged, signed, and responded to the action plan on January 4, 2012. (*Id*. at 158–163.) Plaintiff believed the action plan was "inappropriate and unnecessary" (*id*. at 162) and, in response, submitted that Williams had failed to account for the impact of her ongoing breast cancer recovery (*id*. at 163). Plaintiff also suggested "that giving [her] a VPN [virtual private network] number to perform [her] duties while away from the office would enable [her] to accomplish [her] job even though not in the office." (*Id*.)

Overall, Plaintiff felt that Williams was treating her unfairly (*id*. at 18), so she discussed her concerns with Williams' supervisor, Dennis Egan, and with the assigned human resources professional for Nashville, Jennifer Simmons. For example, Plaintiff states she told Simmons that "Williams would make it very uncomfortable for [her] to feel justified in having to take time off for anything pertaining to the treatment of [her] previous cancer or anything related to follow-up treatments" and that Williams reprimanded her within earshot of her colleagues. (*Id*.) However, Simmons, who is also a breast cancer survivor, testified that she absolutely would have remembered and addressed any complaints related to Plaintiff's breast cancer status.

4

Between October 12, 2011, and February 20, 2012, Plaintiff's corporate credit card reflected non-business related, personal charges, including purchases from Nashville stores Sears, Chico's, Sport Seasons, and Bed Bath & Beyond. (*Id*. at 165.) Williams prepared a written warning dated March 21, 2012, that included an itemized list of the personal charges. (*Id*. at 164.) Citing U.S. Bank's corporate credit card policy, Williams warned Plaintiff that "[a]ny continued personal use of your corporate credit card could lead to further disciplinary action up to and including immediate termination of your employment." (*Id*.) Below the written warning, Williams noted that she delivered it to Plaintiff on March 22 and reminded her on March 26, March 28, and March 29, but that Plaintiff refused to sign the warning on March 30. (*Id*.) Plaintiff recalled telling Williams that she did not remember using the corporate credit card, "but obviously it had been used." (*Id*. at 26.) Plaintiff also admitted that she was used to shopping at Sears, Chico's, Sport Seasons, and Bed Bath & Beyond. (*Id*.) However, Plaintiff denies having made any of the charges in question, denies that she received the March 21 written warning, denies discussing the charges with Williams, and states that Williams never provided her with the itemized list of charges.

In April 2012, Plaintiff's corporate credit card reflected additional personal charges made on April 9, April 13, and April 16, 2012, including charges from Time Life and GRC Meaningful Beauty. (Doc. No. 28-3 at 56, 60.) Plaintiff contends that she did not make these charges and did not know where her corporate credit card was during this time. However, Plaintiff never reported her card lost or stolen, nor did she file a formal dispute regarding the charges. Plaintiff admitted that "it was [her] responsibility to keep track of that card." (Doc. No. 28-1 at 26.) Plaintiff's husband paid off all of the outstanding personal charges on the credit card without pursuing any legal remedies for fraudulent charges. He explained that, in an effort to protect his

5

wife's credit, he chose to pay the charges without knowing what they were because "[w]e never got an invoice at home until after [the credit card] apparently went into default and they started sending us the pay-up-now bills." (Doc. No. 28-4 at 7.)

On April 4, 2012, Plaintiff underwent a second breast reconstruction surgery due to damage stemming from her three recent car accidents. When Plaintiff returned to work on April 16, 2012, Williams instructed her to leave for the stated reason that, because Plaintiff had been on short term disability, she needed to acquire a doctor's release from her treating physician, Dr. Tierney, before returning to work. Plaintiff and Williams each offered differing accounts of this incident. Williams testified that on the morning of April 16, 2012, she approached Plaintiff's work area and said, "I'm surprised you're back" and asked whether Plaintiff had her doctor's release to return to work. (Doc. No. 28-3 at 41.) According to Williams, Plaintiff "started packing up her stuff, got very loud, and said, 'you knew I was going to be out' . . . and didn't want to talk to [her]." (*Id*.) Williams then returned to her office to inform human resources of the incident and to type the following e-mail time stamped 10:48 a.m. to Plaintiff:

> Jaci,
> You should not have come back to work without a Doctors [sic] Release and you are fully aware of that. What I need is a doctors [sic] release for you to be back and or a doctors note as to why you can not [sic] be at work full or part time. You have not been extended by the Hartford[4] since 2/23/12 for partial release and as of today I have not even seen anything approving your absences since 4/4/12.
> You will be expected to call me daily with updates on yours [sic] status until you can provide me the doctors [sic] release or note and are able to return to work full time.

(*Id*. at 42–43, 58.)

---

[4] Williams explained, "The Hartford is the company that the employees deal with when they're on any leave, whether that's short-term, long-term." (*Id*. at 43.)

Williams sent the e-mail and also printed it, signed it, and handed it to Plaintiff before she left for the day. (*Id.* at 42–43.)

According to Plaintiff's recollection, as of April 16, 2012, she had not personally received a copy of her doctor's written release, but her doctor told her that the paperwork had been sent. Plaintiff avers that Williams ordered her to leave the bank, pack up her things, and not return until she had the appropriate documentation, and then walked away without giving Plaintiff a chance to respond. Plaintiff then packed some of her belongings and left. Plaintiff states that she did not receive Williams' email and that at 10:48 a.m. she "would have been in the process of leaving" the bank. (Doc. No. 28-1 at 30.) Plaintiff does admit, however, that she did not contact Williams or anyone else at U.S. Bank on April 17 or 18, 2012, regarding her return to work status, did not make any further attempts after leaving work on April 16 to obtain a written release from her doctor, and never actually obtained a copy of any such written release.

Ultimately, by letter dated April 20, 2012, Williams terminated Plaintiff's employment, citing U.S. Bank's job abandonment and corporate credit card policies and stating two reasons for the termination: (1) that Plaintiff had missed work since April 16, 2012, without contacting Williams with an explanation for the absence, and (2) that, despite a prior written warning, Plaintiff had continued to use the corporate credit card for personal use and was delinquent in making payment. (*Id.* at 166.) Williams had "[c]onversations with HR" before deciding to terminate Plaintiff and she believed that Plaintiff had abandoned her job "[b]ecause she did not call in, did not check in, did not follow up, made no attempt to get ahold of [her] and explain anything." (Doc. No. 28-3 at 45.)

Plaintiff received the termination letter on April 24 or 25, 2012. Plaintiff alleges that U.S. Bank terminated her because immediately after she informed Williams that new lumps were

found in her breast, "Williams began a campaign to set her up for termination." (Doc. No. 37 ¶ 59.) After receiving the termination letter, Plaintiff did not contact Williams, the Human Resources department, or anyone else at U.S. Bank.

### B. Procedural Background

On April 19, 2013, Plaintiff filed a Complaint in the Circuit Court for Davidson County, Tennessee, alleging a claim of discrimination under the Tennessee Disability Act, Tenn. Code Ann. § 8-50-103 ("TDA"). (Doc. No. 1-1 ¶ 24.) On May 20, 2013, U.S. Bank filed a Notice of Removal, removing the case to this Court. (Doc. No. 1.) U.S. Bank filed its Motion for Summary Judgment on June 30, 2014 (Doc. No. 28), along with eight exhibits (Doc. Nos. 28-1–8), a Memorandum in Support (Doc. No. 29), and a Statement of Undisputed Material Facts (Doc. No. 30). Plaintiff moved for partial summary judgment on U.S. Bank's affirmative defenses (Doc. No. 31), and filed a Memorandum in Support (Doc. No. 32), one exhibit (Doc. No. 32-1), and a Statement of Undisputed Material Facts (Doc. No. 33). U.S. Bank filed a Response in Opposition to Plaintiff's Motion for Partial Summary Judgment (Doc. No. 34) and a Response to Plaintiff's Statement of Undisputed Material Facts (Doc. No. 35).

Plaintiff filed a Response in Opposition to U.S. Bank's Motion for Summary Judgment on July 30, 2014 (Doc. No. 38), along with two exhibits (Doc. Nos. 36-1–2), and a Response to U.S. Bank's Statement of Undisputed Material Facts (Doc. No. 37). U.S. Bank moved to strike Plaintiff's counterstatement of the facts as set forth in her Response in Opposition to U.S. Bank's Motion for Summary Judgment. (Doc. No. 40.) Plaintiff responded in opposition to U.S. Bank's Motion to Strike. (Doc. No. 42.)

## II. LEGAL STANDARD

Summary judgment is rendered when "there is no genuine dispute as to any material fact

8

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must demonstrate that the non-moving party has failed to establish a necessary element of that party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment will be granted if "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore*, 93 F.3d 230, 233 (6th Cir. 1996). The movant has the initial burden of informing the district court of the basis for the summary judgment motion and identifying portions of the record that lack a genuine issue of material fact. *See Celotex*, 477 U.S. at 323.

The non-moving party may not rest solely on the allegations in the complaint, but must delineate specific evidence that shows there is a genuine issue for trial. *See id.* at 324. A "mere possibility" of a factual dispute is not sufficient to withstand a properly supported motion for summary judgment. *Baird v. NHP Mill Creek Apartments*, 94 F. App'x 328, 330–31 (6th Cir. 2004) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). A dispute about a material fact is genuine if a reasonable factfinder could find for the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A party asserting or denying that a fact is genuinely disputed may support its position by (1) "citing to particular parts of materials in the record," (2) "showing that the materials cited [by the opposing party] do not establish the absence or presence of a genuine dispute," or (3) showing that "an adverse party cannot produce admissible evidence to support [a] fact." Fed. R. Civ. P. 56(c)(1).

All reasonable inferences are to be drawn in favor of the non-moving party and the evidence of the non-movant is to be believed. *Anderson*, 477 U.S. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . on a motion for summary judgment." *Id.* If the

9

court determines that a reasonable factfinder could not find for the non-moving party, summary judgment must be granted. *See Lexington-South Elkhorn Water Dist.*, 93 F.3d at 233.

## III. ANALYSIS

Plaintiff alleges that U.S. Bank terminated her employment based upon her disability and in violation of the Tennessee Disability Act ("TDA"). U.S. Bank argues that it is entitled to summary judgment on this claim. The TDA prohibits "discrimination in the hiring, firing and other terms and conditions of employment . . . against any applicant for employment based solely upon any physical, mental or visual disability of the applicant." Tenn. Code Ann. § 8-50-103 (2013). "A claim brought under the [TDA] is analyzed under the same principles as those utilized for the Americans with Disabilities Act ('ADA')." *Sasser v. Quebecor Printing (USA) Corp.*, 159 S.W.3d 579, 584 (Tenn. Ct. App. 2004); *accord Cardenas-Meade v. Pfizer, Inc.*, 510 F. App'x 367, 369 n.2 (6th Cir. 2013). However, the TDA does not require a reasonable accommodation. *Cardenas-Meade*, 510 F. App'x at 369 n.3. A plaintiff may establish a claim of disability discrimination either by introducing direct evidence of discrimination or by introducing circumstantial evidence which would support an inference of discrimination. *See Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868–69 (6th Cir. 2007).

In her Response in Opposition to Defendants' Motion (Doc. No. 38), Plaintiff does not point to any direct evidence of discrimination, and the Court does not find any direct evidence of discrimination in the record. Therefore, the Court will apply the burden-shifting framework articulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to determine whether there is sufficient circumstantial evidence of discrimination to proceed to trial.

10

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to provide a "legitimate, nondiscriminatory reason" for the adverse action. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1185 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012). "If the employer offers a legitimate reason for its action that is unrelated to the employee's disability, the plaintiff will bear the burden of establishing that the proffered reason is a pretext for unlawful discrimination." *Id.* at 1185–86.

A. *Prima Facie Case*

Under *McDonnell Douglas*, Plaintiff bears the initial burden of establishing a prima facie case of disability discrimination. *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011). To establish a prima facie case under the ADA, the plaintiff must show that "1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Id.* (quoting *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007)).

U.S. Bank concedes that Plaintiff meets the first two elements of the prima facie case as set forth in *Whitfield* because it agrees that she has a disability and was qualified for her position. (*See* Doc. No. 29 at 8.) The parties do not dispute that Plaintiff was fired and, therefore, suffered an adverse employment decision. The parties stipulated that "[d]uring the time of her diagnosis and treatment [for breast cancer] in 2007, Plaintiff suffered an impairment that substantially limited one or more major life activities," (Doc. No. 27; *see* 42 U.S.C. § 12102(1)(A)–(B)), so U.S. Bank knew of Plaintiff's disability. It appears that Plaintiff's position was not eliminated, so

Plaintiff also meets the fifth element and, therefore, the Court finds that she has established a prima facie case of disability discrimination. However, as explained below, Plaintiff presents insufficient evidence of pretext at step three of the burden-shifting analysis to survive summary judgment.

### B. Legitimate, Non-Discriminatory Reason

Because Plaintiff has met her initial burden, the Court must determine whether U.S. Bank has articulated a legitimate, non-discriminatory reason for the adverse action, termination of Plaintiff's employment. The termination letter outlined two discrete reasons for Plaintiff's termination: (1) a second violation of U.S. Bank's corporate credit card policy, and (2) a violation of U.S. Bank's job abandonment policy. It is undisputed that Plaintiff acknowledged and was bound by both policies and that violation of either policy is a terminable offense at U.S. Bank. It is also undisputed that Plaintiff did not contact Williams or anyone else at U.S. Bank on April 17 or 18, 2012 (or anytime thereafter), thus remaining absent from work for two consecutive work days and failing to report the absences directly to her supervisor, in violation of the job abandonment policy. (*See* Doc. No. 28-1 at 108.) Disability status does not exempt an individual from an employer's reasonable rules of conduct. *See Dockery v. City of Chattanooga*, No. 96-6360, 1997 WL 809979, at *3 (6th Cir. Dec. 23, 1997). Additionally, other courts have recognized both of U.S. Bank's proffered reasons for termination as legitimate, non-discriminatory reasons. *See, e.g.*, *Cunningham v. Tenn. Cancer Specialists, PLLC*, 957 F.Supp.2d 899, 916–17 (E.D. Tenn. 2013) (violation of job abandonment policy by failing to call in for four consecutive days was legitimate, non-discriminatory reason for termination); *Pierri v. Cingular Wireless, LLC*, 397 F.Supp.2d 1364, 1375 (N.D. Ga. 2005) (violation of corporate credit card policy was legitimate, non-discriminatory reason for termination).

12

The Court finds that U.S. Bank has met its burden in articulating not one but two independent, legitimate, non-discriminatory reasons for firing Plaintiff.

### C. Pretext

Because her employer set forth two non-discriminatory reasons for termination, Plaintiff bears the ultimate burden of proving that U.S. Bank's stated reasons were pretextual. *See Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 463 (6th Cir. 2003). "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Id.* (quoting *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 434 (6th Cir. 2002)). First, Plaintiff argues the temporal proximity between informing Williams about the new lumps and the termination shows pretext. Temporal proximity between an employer's first notice of an employee's disability and an adverse action can serve as evidence rebutting a proffered reason, but alone is insufficient to prove pretext. *See Skrjanc v. Great Lakes Power Serv. Co*, 272 F.3d 309, 317 (6th Cir. 2001) (citations omitted). Plaintiff initially told Williams of her disability in 2007 and she was not fired until April 20, 2012. The passage of nearly five years between those events is insufficient to rebut U.S. bank's proffered non-discriminatory reason, as is the passage of over five months between the time Plaintiff told Williams about the new lumps on November 7, 2011 until her April 20, 2012 termination. *See id.* (holding passage of one month between notice of planned leave and discharge insufficient to rebut legitimate, non-discriminatory reason for termination). In any event, "even a strong temporal connection, without more, is insufficient to withstand summary judgment." *Holley v. Giles Cnty.*, 165 F. App'x 447, 451–52 (6th Cir. 2005). On these facts, the Court does not find evidence supporting pretext based on temporal proximity.

Second, Plaintiff argues that circumstantial evidence showing that U.S. Bank's proffered reasons did not actually motivate the termination supports an inference of discrimination. She claims that Williams made comments about Plaintiff discussing her cancer at work, specifically pointing to an instance in 2010 where, after a meeting between Williams, Plaintiff, and a potential business prospect, Williams said, "Well, that was a waste of time. We spent more time talking about cancer issues than we did about anything worthwhile with business." (Doc. No. 28-1 at 20.) Assuming for the purpose of summary judgment that Williams made this comment, such an isolated remark made two years before Plaintiff's termination does not amount to circumstantial evidence of discrimination. *See, e.g.*, *Smith v. Leggett Wire Co*., 220 F.3d 752, 760 (6th Cir. 2000) (finding that stray, allegedly discriminatory comments made long before employee's termination were irrelevant to show discriminatory animus).

Plaintiff seems to raise additional claims of unfair treatment at the hands of Williams. To the extent that Plaintiff argues that Williams' reprimanding her within earshot of colleagues constituted unfair treatment that supports an inference of discrimination, she has presented no comparator evidence that Williams treated other employees differently. In response to the December 2011 action plan, Plaintiff suggested "that giving [her] a VPN number to perform [her] duties while away from the office would enable [her] to accomplish [her] job even though not in the office." (Doc. No. 28-1 at 163.) Plaintiff's request for VPN access came at the time she was working a reduced number of hours at her physician's direction. As Plaintiff testified, Williams only cited the reason of "[s]eparation from work and personal time" for Plaintiff's lack of VPN access. (*Id*. at 19.) This articulated reason has nothing to do with Plaintiff's record of a disability. Furthermore, Plaintiff has not pointed to other employees who were given VPN access or any other relevant comparator evidence on this issue.

14

"To show pretext, [a plaintiff] 'must submit evidence demonstrating that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action.'" *Scott v. Metro Health Corp.*, 234 F. App'x 341, 346 (6th Cir. 2007). In inquiring into the employer's honest belief, "the court looks to whether the employer can establish 'reasonable reliance' on the particularized facts that were before the employer when the decision was made. The key inquiry is whether the employer made a reasonably informed and considered decision before taking adverse action. *Id.* (internal citations omitted). Here, Plaintiff denies making personal charges on her corporate credit card and notes that Williams' lack of effort to investigate or discuss the additional charges made in April 2012 means that Williams did not make a reasonably informed and considered decision regarding disciplining and ultimately firing Plaintiff for credit card misuse. Construing the facts in the light most favorable to Plaintiff, as the Court must on summary judgment, the Court finds a genuine issue of material fact as to whether Plaintiff made the charges in question. A reasonable juror could find that Plaintiff did not violate U.S. Bank's corporate credit card policy.

However, the same does not hold true for U.S. Bank's second stated non-discriminatory reason for termination. On Plaintiff's description of the facts, Williams "did not tell [Plaintiff] to call her everyday [sic] and she did not hand [Plaintiff] an email directing her to call." (Doc. No. 38 at 19.) Plaintiff argues that "Williams was merely trying to create a cover that she had directed [Plaintiff] to call her daily." (*Id*. at 20.) This argument fails because the plain text of U.S. Bank's job abandonment policy, which Plaintiff indisputably acknowledged and was bound by, required Plaintiff to *directly* contact Williams, "*even if [she was] using or applying for STD*

*and/or FMLA time*." (Doc. No. 28-1 at 108.[5])  Even if Plaintiff's doctor had sent the paperwork

clearing her to return to work, Plaintiff still would have violated the job abandonment policy

because she did not contact Williams or anyone else at U.S. Bank on April 17 or 18, 2012.  The

policy is clear that the employee, not a third party, must contact the manager.  (*Id.*)  The

uncontroverted evidence shows that Plaintiff gave her employer the reasonable impression that

she had abandoned her job, and Plaintiff has failed to put forth evidence that Williams did not

honestly believe this.  Plaintiff "must allege more than a dispute over the facts upon which [her]

discharge was based.  [She] must put forth evidence which demonstrates that the employer did

not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment

action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir. 2001) (citation omitted).  As

the Sixth Circuit has reasoned:

> In deciding whether an employer reasonably relied on the particularized facts then
> before it, we do not require that the decisional process used by the employer be
> optimal or that it left no stone unturned.  Rather, the key inquiry is whether the
> employer made a reasonably informed and considered decision before taking an
> adverse employment action.

*Id.* at 494 (quoting *Smith v. Chrysler*, 155 F.3d 799, 807 (6th Cir. 1998)).

Williams' "[c]onversations with HR" before deciding to terminate Plaintiff and Plaintiff's

failure to call in, check in, follow up, or make any attempt to contact Williams (Doc. No. 28-3 at

45) provided U.S. Bank the basis to make a "reasonably informed and considered decision" in

---

[5] Plaintiff notes that U.S. Bank's job abandonment policy "does not mandate that [Plaintiff] be terminated
in these circumstances, providing that being absent for more than two days <u>may</u> result in job
abandonment and also providing that extenuating circumstances may change the situation."  (Doc. No. 38
at 20.)  However, it is not this Court's role to act as a "super-personnel department" substituting
its judgment for that of management.  *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004)
(internal citations omitted).

firing Plaintiff on April 20, 2012. Plaintiff has failed to prove pretext. Accordingly, the Court grants summary judgment to U.S. Bank on Plaintiff's disability discrimination claim.

## IV.    CONCLUSION

For the reasons stated above, Defendants' Motion (Doc. No. 28) is **GRANTED**, Plaintiff's Motion for Partial Summary Judgment (Doc. No. 31) is **DENIED**, and Defendants' Motion to Strike (Doc. No. 40) is **DENIED AS MOOT**.    By this Order, Plaintiff's Motions in Limine (Doc. Nos. 51, 53, and 59) are **DENIED AS MOOT**.  The pretrial conference scheduled on Friday, October 30, 2015 and the trial  scheduled on Tuesday, November 10, 2015 are **CANCELLED** and the Clerk is **DIRECTED** to **CLOSE** this case.

It is so ORDERED.

Entered  this the 30th day of September, 2015.


_____
JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT

17